**CLARKSON LAW FIRM, P.C.**
Shireen M. Clarkson (SBN 237882)
*sclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Benjamin J. Fuchs (SBN 320793)
*bfuchs@clarksonlawfirm.com*
Samuel M. Gagnon (*pro hac vice* forthcoming)
*sgagnon@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAX ULRICH and RYAN SCHAVRIEN, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>ABBOTT LABORATORIES,<br><br>           Defendant. | Case No.: 3:24-cv-9452<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)<br>2. VIOLATION OF CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*)<br>3. VIOLATION OF UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)<br>4. BREACH OF WARRANTY<br>5. UNJUST ENRICHMENT<br><br>**JURY TRIAL DEMAND** |

*Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265*

CLASS ACTION COMPLAINT

Plaintiffs Ryan Schavrien and Max Ulrich ("**Plaintiffs**"), individually and on behalf of all others similarly situated, as more fully described below (the "**Class**" and "**Class Members**"), bring this class action complaint against Abbott Laboratories ("**Defendant**" and/or "**Abbott**") and allege the following based upon information and belief, unless otherwise expressly stated as based upon their personal knowledge.

## I.    INTRODUCTION

1.    Two things are true of most parents and other child caregivers: They love their children more than anything and will go to great lengths to protect their health, safety, and wellbeing. Manufacturers of children's products understand these core values of their target demographic.

2.    Manufacturers also recognize another near-universal truth: Parents are not nutritional experts and therefore rely on them to accurately represent the risks and benefits of products designed for children, including foods and beverages.

3.    Unfortunately, these truths have led to a history of marketing abuse by leading manufacturers. In the late 1970s, the abuse centered on baby formula. The industry dangerously promoted manufactured formulas as healthy replacements for breastfeeding or cow's milk, even though manufactured formula was linked to hundreds of thousands of preventable infant deaths in low- and middle-income countries worldwide.

4.    Fortunately, the FDA intervened and established strict nutritional and labeling requirements for all manufactured infant formulas sold in the United States. But infants were defined to include only children up to 12 months of age.

5.    This left a regulatory gap that persists today: children over 12 months. In response, leading manufacturers invented a whole new category of beverages to continue marketing to parents unregulated. They referred to it as "formula" for children over the age of 12 months, sometimes calling it "toddler milk." Unlike real baby formula, this was, and remains, a nutritionally unnecessary and manufactured concoction.

///

///

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

6. To convince parents that "toddler milk" was a legitimate and beneficial product, manufacturers marketed it in the same way as they had marketed infant formula before the FDA stepped in: as a healthy choice. That false marketing continues today, unchecked.

7. This consumer class action arises from the role of Abbott Laboratories in perpetuating this ongoing and harmful market fraud. Their wildly popular toddler formulas—Similac "Go & Grow" and PediaSure "Grow & Gain"—are littered with prominent representations about "Complete, Balanced Nutrition" and similar health claims related to children's growth and brain development.

8. But these manufactured concoctions, like the infant formula of the 1970s, are not comparable to real milk or any other beverage with nutritional value. Instead, Abbott injects up to 12 grams of added sugar per serving, equivalent to almost half a can of soda—for very young children.

9. The drinks' primary ingredients—sugar, corn syrup, vegetable oils, and highly processed carbohydrates—render Abbott's health marketing claims dangerously false. While this is true for all children Abbott targets, it is particularly egregious for children under the age of two, given the medical consensus that children this young should not consume *any* added sugars.

10. Abbott's front-label promises to improve brain development with the added ingredient DHA are also demonstrably false because DHA does not have beneficial effects on cognitive development or executive function in children.

11. Finally, Abbott promises parents that pediatricians recommend its sugar-laden formulas. In truth, health experts have been sounding the alarm about this market epidemic: soda-like beverages masquerading as toddler "formula" or "milk." As a result, major health and pediatric organizations worldwide have condemned the use and sale of toddler "nutritional drinks" because they are unnecessary, pose harm to young children, and have established poor nutritional outcomes.[1]

---

[1] See, e.g., *Decreasing Community Toddler Formula Use*, American Academy of Pediatrics (April 14, 2022), https://www.aap.org/en/advocacy/community-health-and-advocacy/community-pediatrics-funded-projects/decreasing-community-toddler-formula-use/ (last visited Dec. 23, 2024).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

2

12.     Against this backdrop, Abbott's label claims are meaningfully false. This harms not only parents who pay a premium for the beverages, believing they are doing something good for their children, but also hundreds of thousands of children now being raised on a fake "formula" invented to evade FDA review and with health outcomes as bad as the sugar with which they are loaded.

13.     Plaintiffs, deceived by Abbott's false advertising, now bring this consumer class action as concerned parents of young children, and on behalf of all others similarly deceived, to hold the $47 billion formula industry accountable for this alarming health fraud and put an end to Abbott's outsized role in it.

14.     **The Products**. The products at issue are Abbott's two branded lines of drinks aimed at children: (1) Similac Go & Grow and (2) PediaSure Grow & Gain (collectively, the "**Products**").

15.     ***Similac Go & Grow:*** Abbott's Similac Go & Grow products at issue are all flavors and varieties of (1) Similac Go & Grow 360 Total Care Powder (2) and Similac Go & Grow 360 Total Care Sensitive Powder.

16.     Abbott makes the following representations on the front labels of these beverages: (1) claims of nutritional value for toddlers, including that the beverages are "Toddler Drinks" providing "360 Total Care" for young children of "12-36 months"; and (2) implied representations that the inclusion of the ingredient docosahexaenoic acid ("**DHA**") will improve toddlers' brain development, including through prominent references to "DHA" and "Brain Development."

17.     Images of Abbott's Similac Go & Grow Products are below:

///

///

///

///

///

///

///

///

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







18. ***PediaSure Grow & Gain:*** Abbott's PediaSure Grow & Gain products at issue are all flavors and varieties of PediaSure Grow & Gain Bottles, PediaSure Grow & Gain Cans, PediaSure Grow & Gain Fiber, PediaSure Grow & Gain Shake Mix Powder, and PediaSure SideKicks.

19. Abbott makes the following representations on the front labels of these beverages: (1) claims of nutritional value for children, including that the beverages provide "Complete, Balanced Nutrition" and "Balanced Nutrition to Help Fill Gaps"; (2) claims that the beverages are the "#1 Pediatrician Recommended Brand"; and (3) claims that the beverages will aid young children's brain development through the mention of "DHA" as a component of the drinks (collectively with Similac Go & Grow representations detailed above, the "**Challenged Representations**").

CLASS ACTION COMPLAINT

20.    Images of Abbott's PediaSure Grow & Gain Products are below:



CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265



CLASS ACTION COMPLAINT

21.     Each of the Challenged Representations Abbott makes on these Products' front labels is false and misleading because (1) Abbott's toddler beverages do *not* provide balanced nutrition to toddlers, (2) Abbott's toddler beverages are *not* recommended by pediatricians, and (3) the DHA in Abbott's toddler beverages does *not* support brain development. Instead, these beverages, which are loaded with sugar, corn syrup, vegetable oils, and powdered milk, are harmful to toddlers' health.

22.     Abbott displays false, misleading, and deceptive claims on the front labels of its toddler beverages to obscure from parents the truth about the actual quality and health effects of these Products. This intentional misrepresentation of the nutritional value misleads parents about the Products' benefits, violating California consumer protection laws and leading parents and caregivers to provide their toddlers with sugary, harmful drinks that are disguised as healthy choices.

23.     Abbott's false, deceptive, and misleading claims that these Products provide balanced nutrition, are pediatrician-recommended, and support toddlers' brain development led Plaintiffs and other similarly situated reasonable consumers to incorrectly believe that the Products are nutritious, pediatrician-recommended beverages beneficial to toddlers' brain development and overall health.

24.     Through falsely, misleadingly, and deceptively labeling, advertising, and marketing the Products, Abbott has sought to take advantage of unwitting consumers, allowing Abbott to establish and maintain an unfair competitive advantage over Abbott's lawfully acting competitors.

25.     **Primary Dual Objectives.** Plaintiffs bring this action individually and in a representative capacity on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class and/or Subclass defined *infra*) for dual primary objectives. ***One***, Plaintiffs seek, on Plaintiffs' individual behalf and on behalf of the Class/Subclass, a monetary recovery of the price premium Plaintiffs and consumers have overpaid for Products that should— but fail to—comport with the Challenged Representations, as consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted). ***Two***, Plaintiffs seek, on Plaintiffs' individual behalf and on behalf of the Class/Subclass, injunctive relief to stop Abbott's unlawful manufacture, marketing, and sale of the Products with the Challenged Representations to avoid or mitigate the risk of deceiving the public into believing that the Products are nutritious, pediatrician-

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

11

recommended drinks that support toddlers' brain development and overall health by requiring Abbott to change its business practices to immediately cease and desist from selling the unlawful Products in violation of law, which may include one or more of the following: removal or modification of the Challenged Representations from the Products' labels and Abbott's website and marketing materials; and/or discontinuance of the Products' manufacture, marketing, and/or sale.

## II.    JURISDICTION

26.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Section 1332, because: (1) the Class consists of 100 or more members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) minimal diversity exists because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

27.    Abbott is subject to personal jurisdiction in California based upon sufficient minimum contacts that exist between Abbott and California. Abbott is authorized to do and is doing business in California, and Abbott advertises, markets, and sells its Products in California. Abbott has purposefully availed itself of the protections of California law and should reasonably expect to defend itself in court in California for harm arising out of its pervasive contacts with the state.

## III.    VENUE

28.    Venue is proper in this District under 28 U.S.C. Section 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims occur in this District: Abbott advertises, markets, distributes and sells the Products in this District, gaining substantial revenue and profits from doing business in this District, including through monies consumers pay Abbott in this District.

## IV.    PARTIES

29.    **Plaintiff Max Ulrich.** The following is alleged based upon Plaintiff Ulrich's personal knowledge:

      a.    **Residence.** Plaintiff Ulrich is a resident of Sonoma County in the state of California.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

b. **Purchase Details.**

- Plaintiff Ulrich repeatedly purchased Abbott's Similac Go & Grow 360 Total Care Powder and Similac Go & Grow 360 Total Care Sensitive Powder Products for his young son's consumption between approximately mid-2021 and mid-2022. Plaintiff Ulrich purchased these Products from various retailers, including Target, Safeway, and Albertsons stores, in the Santa Rosa, California area.

- Plaintiff Ulrich also purchased Abbott's PediaSure Grow & Gain Products for his son's consumption at various retailers, including Target and Walmart stores, in the Santa Rosa, California area on multiple occasions in early 2023.

c. **Reliance on Challenged Representations**. In making his purchases, Plaintiff Ulrich read the Challenged Representations on the Products' labeling, leading him to believe that the Products were nutritious for young children, that they were recommended by pediatricians, and that the ingredient DHA supported toddlers' brain development.

d. **No Actual Knowledge of Falsity.** At the time of his purchases, Plaintiff Ulrich did not know that the Challenged Representations were false in that he did not know that the Products were not nutritious for toddlers, that they were not recommended by pediatricians, and that the ingredient DHA did and does not support brain development.

e. **No Notice of Contradictions.** Plaintiff Ulrich did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' labels that contradicted the prominent Challenged Representations or otherwise suggested that the Products were not, in fact, nutritious, pediatrician-recommended, or beneficial for toddlers' brain development.

f. **Causation/Damages.** Plaintiff Ulrich would not have purchased the Products or would not have paid as much for the Products but for the Challenged

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

13

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Representations—i.e., that the Products are nutritious for toddlers, that they are recommended by pediatricians, and that DHA supports toddlers' brain development.

g. **Desire to Repurchase.** Plaintiff Ulrich continues to see the Products available for purchase and would consider purchasing the Products again in the future if he could be sure the Products delivered the qualities they advertised.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Ulrich is not personally familiar with the formulation of the Products, as he does not possess any specialized knowledge, skill, experience, or education in the manufacturing of toddler formula or the effect of certain nutrients on toddlers' brain development. Thus, Plaintiff Ulrich is unable to determine whether the Products' Challenged Representations—i.e., whether the Products are nutritious for toddlers, recommended by pediatricians, or support toddlers' brain development through the inclusion of DHA—are true.

i. **Plaintiff Ulrich's Future Harm.** Abbott continues to market and sell the Products with the Challenged Representations. Plaintiff Ulrich is an average consumer who is not sophisticated in the manufacturing of toddler formula or the effect of certain nutrients on brain development. Since Plaintiff Ulrich would like to purchase the Products again in the future despite the fact that the Products were once marred by false advertising or warranties, he would likely and reasonably—but incorrectly—assume in such a scenario that the Products are nutritious for toddlers, that they are recommended by pediatricians, and that the ingredient DHA supports toddler brain development as advertised. Accordingly, Plaintiff Ulrich is at risk of reasonably—but incorrectly—assuming that Abbott has fixed the Products such that he may buy them again with the belief that they are no longer falsely advertised and warranted. In this regard, Plaintiff Ulrich is currently—and will continue to be—deprived of the ability to purchase the Products.

30.    **Plaintiff Ryan Schavrien.** The following is alleged based upon Plaintiff Ryan Schavrien's personal knowledge:

a.    **Residence.** Plaintiff Schavrien is a resident of San Bernadino County in the state of California.

b.    **Purchase Details.** Plaintiff Schavrien repeatedly purchased Abbott's PediaSure Grow & Gain Bottles in varying package sizes from Target and Sam's Club stores in the Redlands and San Bernardino, California areas for his young son's consumption between approximately 2016 and April 2024. Plaintiff Schavrien paid between approximately $13.99 and $29.99 for the Products during his purchases.

c.    **Reliance on Challenged Representations**. In making his purchases, Plaintiff Schavrien read the Challenged Representations on the Products' labeling, leading him to believe that the Products were nutritious for young children, that they were recommended by pediatricians, and that they supported his child's brain development because they contained the ingredient DHA.

d.    **No Actual Knowledge of Falsity.** At the time of his purchases, Plaintiff Schavrien did not know that the Challenged Representations were false in that he did not know that the Products are not nutritious for toddlers and other children, that they are not recommended by pediatricians, and that the ingredient DHA does not support brain development.

e.    **No Notice of Contradictions.** Plaintiff Schavrien did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' labels that contradicted the prominent Challenged Representations or otherwise suggested that the Products were not, in fact, nutritious, pediatrician-recommended, or beneficial for young children's brain development.

f.    **Causation/Damages.** Plaintiff Schavrien would not have purchased the Products or would not have paid as much for the Products but for the Challenged Representations—i.e., that the Products are nutritious for toddlers, that they are

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

recommended by pediatricians, and that DHA supports young children's brain development.

g. **Desire to Repurchase.** Plaintiff Schavrien continues to see the Products available for purchase and would consider purchasing the Products again in the future if he could be sure the Products delivered the qualities they advertised.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Schavrien is not personally familiar with the formulation of the Products, as he does not possess any specialized knowledge, skill, experience, or education in the manufacturing of toddler formula or the effect of certain nutrients on young children's brain development. Thus, Plaintiff Schavrien is unable to determine whether the Products' Challenged Representations—i.e., whether the Products are nutritious for young children, are recommended by pediatricians, or support children's brain development through the inclusion of DHA—are true.

i. **Plaintiff Schavrien's Future Harm.** Abbott continues to market and sell the Products with the Challenged Representations. Plaintiff Schavrien is an average consumer who is not sophisticated in the manufacturing of toddler formula or the effect of certain nutrients on brain development. Since Plaintiff Schavrien would like to purchase the Products again in the future despite the fact that the Products were once marred by false advertising or warranties, he would likely and reasonably—but incorrectly—assume in such a scenario that the Products are nutritious for toddlers, that they are recommended by pediatricians, and that the ingredient DHA supports toddler brain development as advertised. Accordingly, Plaintiff Schavrien is at risk of reasonably—but incorrectly—assuming that Abbott has fixed the Products such that he may buy them again with the belief that they are no longer falsely advertised and warranted. In this regard, Plaintiff Schavrien is currently—and will continue to be—deprived of the ability to purchase the Products.

///

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

31.    **Defendant Abbott Laboratories** is an Illinois-registered corporation with its principal place of business in Lake County, Illinois. Abbott was doing business in the state of California at all relevant times. Directly and through its agents, Abbott maintains substantial contacts with and receives substantial benefits and income from and through the state of California. Abbott is the owner, manufacturer, and/or distributor of the Products. Abbott and its agents promoted, marketed and sold the Products at issue throughout the United States, including in particular within the state of California. The unfair, unlawful, deceptive, and misleading Challenged Representations on the Products were prepared, authorized, ratified, and/or approved by Abbott and its agents to mislead and deceive consumers in the state of California into purchasing the Products. Additionally, Abbott knew of the falsity of the Challenged Representations, but it failed to disclose their falsity at the time Plaintiffs, and all Class Members, purchased the Products, notwithstanding Abbott's duty to do so. Further, Abbott had the right and authority, at all relevant times, to discontinue use of the Challenged Representations, including the time leading up to and through the incidents giving rise to the claims asserted (including Plaintiffs' purchase of the Products described *supra* and all Class Members' purchases of the Products).

## V.    FACTUAL ALLEGATIONS

### A.    Background

32.    In November 1979, the U.S. Food and Drug Administration ("**FDA**") was confronted with a major health crisis. A popular infant formula had been found to be deficient in the essential nutrient chloride, with this deficiency causing severe health consequences in infants. This revelation came amid growing global recognition of the dangers of promoting manufactured formulas for very young children as healthy replacements for breastfeeding or cow's milk, with formula use linked to hundreds of thousands of preventable infant deaths annually in low- and middle-income countries worldwide.[2]

---

[2] Jesse K. Anttila-Hughes, et al., *Mortality from Nestlé's Marketing of Infant Formula in Low and Middle-Income Countries*, NATIONAL BUREAU OF ECONOMIC RESEARCH (2018 (revised 2023)), https://www.nber.org/papers/w24452.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

33.    These discoveries prompted public demands for governmental responses to protect human health by ensuring that all commercially distributed infant formula was nutritionally adequate and otherwise not harmful to human health.

34.    The government responded: In 1980, the United States enacted the Infant Formula Act, codified at 21 U.S.C. Section 350a ("**Act**"), establishing strict nutritional standards and labeling requirements for all infant formula sold in the United States. The FDA defined infant formula as food that may be the sole source of nutrition for infants—i.e., children up to 12 months of age—as an alternative to human milk.

35.    A year later, the World Health Organization ("**WHO**") passed the 1981 International Code of Marketing Breastmilk Substitutes. Recognizing the well-documented benefits of feeding infants breastmilk instead of formula, as well as the unique vulnerability of parents and other caretakers to deceptive formula marketing, the WHO advised countries to *completely prohibit* the marketing of infant formula. (Today, formula is one of only two products in the world for which there are international recommendations that countries prohibit their marketing. *The other is tobacco.*[3])

36.    Faced with the costs of navigating the sweeping new regulatory regime created under the Infant Formula Act, the United States' formula industry devised a new way to protect and maximize their profits: by targeting slightly older children with similar beverages marketed as "toddler formulas." By pivoting to marketing formulas to the parents and caretakers of young children 12 months and older, formula multinationals evaded the FDA's infant formula regulations that applied to babies under that age.

37.    This remains the dynamic today: While the FDA continues to strictly regulate the contents and marketing of *infant* formulas—e.g., by requiring that each infant formula pass a pre-market review, contain minimum volumes of 30 specified nutrients, be "safe  and suitable" for its intended use, and comply with specific labeling requirements—these regulations do not apply to

---

[3] Heather Vogell, *The U.S. Government Defended the Overseas Business Interests of Baby Formula Makers. Kids Paid the Price*, PROPUBLICA (Mar. 21, 2024), https://www.propublica.org/article/how-america-waged-global-campaign-against-baby-formula-regulation-thailand.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

*toddler* formulas, which the FDA does not view as nutritionally necessary.[4] In fact, there is currently *no regulatory standard* governing the composition of toddler formulas in the United States.[5]

38.    Pediatric organizations worldwide agree that toddler beverages provide no nutritional benefit over a diet of cow's milk and regular food, and that toddler beverages can be harmful for toddlers' health.[6] For example,  toddler formulas, like Abbott's, typically contain added sugars from ingredients like corn syrup despite a medical consensus that children under the age of two should not consume *any* added sugars.[7] Experts have also concluded that such regular consumption of added sugars can condition toddlers to a sugar-laden diet at a very young age when their taste preferences are forming and highly impressionable, potentially leading to long-term health implications.[8]

39.    Despite the negative health effects, formula manufacturers, including Abbott, have engaged in aggressive and unregulated marketing of toddler formulas, misleading consumers to believe that toddler formulas are healthier than cow's milk overall and for specific benefits such as brain development[9] and immune function.[10]

40.    International pediatric organizations have predictably found that such deceptive toddler formula marketing has prompted consumers to use toddler formulas interchangeably with

---

[4] *Infant Formula*, U.S. FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/food/resources-you-food/infant-formula (Dec. 2, 2024); *see also* Maria Godoy, *New report warns that beverages marketed as toddler formulas are not necessary*, NPR (Oct. 24, 2023), https://www.npr.org/2023/10/24/1208165047/new-report-warns-that-beverages-marketed-as-toddler-formulas-are-not-necessary.

[5] George J. Fuchs, III, MD, FAAP, et al., *Older Infant-Young Child "Formulas,"* THE AMERICAN ACADEMY OF PEDIATRICS (Oct. 20, 2023), https://doi.org/10.1542/peds.2023-064050.

[6] *Id.*

[7] Yoon Y Choi, et al., *Medical experts recommend that children under 2 years of age should not consume* any *added sugar. US toddler milk sales and associations with marketing practices*, CAMBRIDGE UNIVERSITY PRESS (Feb. 4, 2020), https://www.cambridge.org/core/journals/public-health-nutrition/article/us-toddler-milk-sales-and-associations-with-marketing-practices/60781FD9D8C193EFFF474E0A6BBDBA3C.

[8] Claire McCarthy, M.D., *Do toddler formulas deliver on nutrition claims? So-called toddler formulas are costly, unnecessary, and sometimes even unhealthy*, HARVARD HEALTH PUBLISHING (Nov. 27, 2023), https://www.health.harvard.edu/blog/do-toddler-formulas-deliver-on-nutrition-claims-202311272996.

[9] Bonny Jasani, et al., *Long chain polyunsaturated fatty acid supplementation in infants born at term*, COCHRANE DATABASE OF SYSTEMATIC REVIEWS (Mar. 10, 2017) https://doi.org/10.1002/14651858.CD000376.pub4 (finding through a 2017 meta-analysis of 15 studies no definitive link between the consumption of DHA (touted by formula manufacturers for its alleged brain development benefits) and brain development).

[10] *Id.*

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

infant formulas on the mistaken belief that they contain comparable nutritional components and convey similar health benefits, inducing caregivers to feed infants toddler formulas that do not provide adequate nutrition.[11] Formula manufacturers have an obvious financial incentive to target "the sippy cups of the world"[12] by aggressively marketing the claimed health benefits of components such as DHA.

41.    Abbott's marketing and promotion of the Products are part and parcel of this alarming and unregulated trend. Abbott not only sells Products that are generally unhealthy, but also places specific, false, and misleading claims on the Products' front labels, deceiving consumers into believing that they are beneficial—and even essential—for their toddlers' health and development.

42.    The Products are labeled with one or more of the Challenged Representations, as follows:

1) Similac Go & Grow 360 Total Care Powder (labeled and advertised with Challenged Representations "Toddler Drink," "360 Total Care," "12-36 months," "DHA," and "Brain Development")

2) Similac Go & Grow 360 Total Care Sensitive Powder (labeled and advertised with Challenged Representations "Toddler Drink," "360 Total Care," "12-36 months," "DHA," and "Brain Development")

3) PediaSure Grow & Gain Bottles (labeled and advertised with Challenged Representations "Complete, Balanced Nutrition," "#1 Pediatrician Recommended Brand," and "DHA Omega-3")

4) PediaSure Grow & Gain Cans (labeled and advertised with Challenged Representations "#1 Pediatrician Recommended Brand" and "DHA Omega-3")

5) PediaSure Grow & Gain Fiber (labeled and advertised with Challenged Representations "Complete, Balanced Nutrition," "#1 Pediatrician Recommended Brand," and "DHA Omega-3")

---

[11] *Id.*
[12] Vogell, *supra* note 3 (reporting statement by chief financial officer and treasurer of DHA manufacturer Martek Biosciences Corp. explaining to analysts that formula companies used DHA "as a hook to expand their market share" by marketing to the parents of caregivers of babies and toddlers).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

CLASS ACTION COMPLAINT

6) PediaSure Grow & Gain Shake Mix Powder (labeled and advertised with Challenged Representation "#1 Pediatrician Recommended Brand"); *and*

7) PediaSure SideKicks (labeled and advertised with Challenged Representations "Balanced Nutrition to Help Fill Gaps" and "#1 Pediatrician Recommended Brand").

43.     Abbott reinforces its false label claims through numerous statements on its official websites, www.pediasure.com and www.similac.com, further demonstrating the company's intent and knowledge that such claims are material to consumers. These website statements include:

Statements from www.pediasure.com:

- "PediaSure is a delicious nutrition drink that complements a diet for kids who are behind in growth"

- "DHA omega-3 for brain and eyes"

- "PediaSure Grow & Gain and PediaSure Grow & Gain with Fiber are sources of complete, balanced nutrition to help kids grow when inadequate growth is a concern"

- "PediaSure SideKicks is nutrition to help fill gaps"; *and*

- "PediaSure SideKicks shakes are intended to be a nutritious choice to help balance out a picky eater's uneven diet".

Statements from www.similac.com:

- "Go & Grow 360 Total Care has our exclusive blend of DHA for brain and eye development"

- "Go & Grow 360 Total Care Sensitive has our exclusive blend of DHA for brain and eye development"

- "Designed for toddlers aged 12-36 months old"

- "WHOLE-TODDLER SUPPORT: For immune support, brain development, and digestive health"

- "BRAIN & EYE DEVELOPMENT: Our exclusive blend of DHA for brain and eye development"

- "Helps Provide Building Blocks for Your Toddler's Developing Brain"

- "Help Balance your Toddler's Diet"; *and*

- "Helps Support Growth & Development".

**B.**     **The Products Are Not Nutritious and Include a Harmful Amount of Sugar**

44.    Abbott's Products, marketed as nutritious to children as young as one year old, contain up to 12 grams of added sugar per serving—equivalent to the sugar in half a can of soda. This is directly at odds with medical guidelines, which state that children under the age of two should consume no added sugar at all.[13] In all cases, added sugar is toxic to the human body and greatly increases the risk of cardiovascular disease, diabetes, obesity, cancer, and a wide variety of other chronic diseases.[14]

45.    Children in particular have a strong preference for a sweet taste, and early introduction of added sugars in the diet of toddlers can promote sweet-taste preference and result in an increased likelihood of consuming excessive sugar-sweetened beverages and food later in life.

46.    Despite the associated negative health risks of sugar consumption in children, Abbott adds in its purportedly nutritious Products alarming amounts of sugar:

1) Similac Go & Grow 360 Total Care Powder: Four grams per serving, but Abbott recommends two servings (i.e., eight grams total)

2) Similac Go & Grow 360 Total Care Sensitive Powder: Three grams per serving, but Abbott recommends two servings (i.e., six grams total)

3) PediaSure Grow & Gain Fiber (Vanilla, Chocolate, Strawberry): Twelve grams

4) PediaSure Sidekicks: Twelve grams

5) PediaSure Grow & Gain Bottles (Vanilla, Chocolate, Strawberry, Banana flavors): Nine grams

6) PediaSure Grow & Gain Cans (Vanilla, Chocolate): Nine grams

7) PediaSure Grow & Gain Fiber (Vanilla, Chocolate, Strawberry): Twelve grams

8) PediaSure Grow & Gain Shake Mix Powder (Vanilla, Chocolate, Strawberry): Eight grams

[13] Choi, et al., *supra* note 7.
[14] *Sugar: How Bad Are Sweets for Your Kids?*, CLEVELAND CLINIC (July 5, 2024), https://health.clevelandclinic.org/sugar-how-bad-are-sweets-for-your-kids (last visited Dec. 26, 2024).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

9) PediaSure Sidekicks: Twelve grams

47.    Up to 20 percent of the calories in the Products come from added sugar. That is 20 percent more than what is safe for children younger than two,[15] and unhealthy for children of all ages. Abbott's health representations characterizing the Products as providing "Balanced Nutrition" are thus false, misleading, and deceptive.

48.    Excessive consumption of added sugar is toxic to the human body and greatly increases the risk of cardiovascular disease, diabetes, liver disease, and a wide variety of other chronic diseases—*especially* in children.[16] Beyond these immediate health risks, regular consumption of added sweeteners at such a young age when toddlers, who are naturally predisposed to enjoying and seeking out sweet foods and beverages, are forming their dietary tastes can condition them to normalize and expect a sweetener-laden diet, potentially leading to longer-term health implications.[17]

49.    Due to the severity of the adverse health outcomes associated with excess added sugar consumption in childhood, the American Heart Association[18] and U.S. Centers for Disease Control and Prevention[19] recommend that children younger than two years old should not be given *any* foods or beverages with added sugars.[20] Similar guidance exists for all children. Still, Abbott injects the toddler drinks with excessive sugar and targets all children, including those under two.

50.    Additionally, Abbott's Products contain ingredients other than added sugars that are known to harm human health. These include maltodextrin, which has been shown to damage tooth

---

[15] This group includes infants as well as the portion of toddlers between the ages of one and two years, as Abbott and other leading manufacturers routinely "cross-promote" their infant and toddler formulas to engender brand loyalty, causing confusion among consumers and reportedly prompting some caregivers to feed toddler formulas to infants on the mistaken assumption that the products are interchangeable. Jasani, et al., *supra* note 9.

[16] *Sugar: How Bad Are Sweets for Your Kids?*, *supra* note 14.

[17] McCarthy, *supra* note 8.

[18] *Kids and added sugars: How much is too much?*, AMERICAN HEART ASSOCIATION (Aug. 22, 2016), https://www.heart.org/en/news/2023/05/23/kids-and-added-sugars-how-much-is-too-much (last visited Dec. 23, 2024).

[19] *Get the Facts: Added Sugars*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 5, 2024), https://www.cdc.gov/nutrition/php/data-research/added-sugars.html (last visited Dec. 23, 2024).

[20] *Kids and added sugars: How much is too much?*, *supra* note 18.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

enamel among children who consume drinks containing maltodextrin.[21] Maltodextrin—a carbohydrate—also has a significant glycemic index—one that supersedes that of table sugar.[22] Furthermore, maltodextrin interacts with sucralose to impair insulin sensitivity[23] and has been identified as a factor that can influence the gut microbiome.[24]

### C.   The Pediatrician-Recommended Statements are Misleading

51.   Abbott claims that its PediaSure products are the "#1 Pediatrician Recommended Brand." In truth, there is a consensus among leading health and pediatric organization worldwide condemning the use and sale of such toddler "nutritional drinks."[25] For instance, the American Academy of Pediatrics advises against using toddler formula, citing "established poor nutritional outcomes," and describes toddler formula as "unnecessary and potentially harmful to young children."[26]

52.   Health organizations recommend that parents should not feed their children "toddler formulas" for good reason: Toddler formulas do not provide any nutritional advantage over a well-balanced diet that includes human milk and/or cow's milk, and the presence of high amounts of added sugars these formulas commonly contain are extremely unhealthy for toddlers and especially so for those under the age of two.[27]

### D.   DHA Does Not Support Brain Development

53.   Abbott prominently labels its Products with "DHA Omega-3," "DHA," and/or "Brain Development," claiming benefits for toddlers' brain development. In reality, DHA *does not* support brain development in very young children.[28]

---

[21] Denise L. Hofman, et al., *Nutrition, Health, and Regulatory Aspects of Digestible Maltodextrins*, CRITICAL REVIEWS IN FOOD SCIENCE AND NUTRITION (Feb, 12, 2015), https://www.tandfonline.com/doi/full/10.1080/10408398.2014.940415.
[22] Christine Mikstas, *What is maltodextrin?*, NOURISH BY WEBMD (July 10, 2023), https://www.webmd.com/diet/what-is-maltodextrin.
[23] Claire Greenhill, *Metabolic effects of sucralose*, 16 NAT. REVS. ENDOCRINOLOGY 256-257 (2020), https://www.nature.com/articles/s41574-020-0348-6.
[24] *Id.*
[25] See, e.g., Fuchs, *supra* note 5.
[26] *Decreasing Community Toddler Formula Use*, *supra* note 1.
[27] *Sugar: How Bad Are Sweets for Your Kids?*, *supra* note 14.
[28] Jasani, et al., *supra* note 9 (summarizing multiple medical studies finding no link between DHA intake and brain development).

24

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

54.     DHA is an omega-3 fatty acid that is a primary structural component of the human brain. However, *supplementing a toddler's diet with DHA does not support brain development.*[29] A comprehensive 2018 study concluded that DHA supplementation in toddlers has *no beneficial effect* on cognitive development or measures of executive function.[30] Worse, DHA supplementation may actually result in *negative* effects on language development and effortful control in certain subgroups of children.[31] Additional studies confirm that DHA supplementation has no effect on neurodevelopmental outcomes such as cognitive and language composites and visual-motor integration in toddlers.[32]

55.     Abbott's brain development claims also mislead consumers about the overall impression of the Products, as such claims have been shown to influence parents' (incorrect) belief that toddler formulas are healthier and more nutritionally advantageous than cow's milk when they are not.[33]

56.     Abbott's DHA statements also violate 21 C.F.R. 101.13(b)(3), which prohibits nutrient content claims on food intended specifically for children under two years of age, with a narrow exception (inapplicable here) for "percentages claims" of vitamins and minerals made in relation to a Reference Daily Intake ("**RDI**").

57.     The FDA defines an implied nutrient content claim as any claim that "[s]uggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient." 21 C.F.R. 101.13(2)(ii).

58.     Abbott represents on the front labels of its Similac Products that these Products are intended for children under the age of two by advertising the Products as being appropriate for toddlers "12-36 months" old. On the same labels, Abbott makes implied nutrient content claims by advertising that the Products contain DHA to promote "Brain Development." These Challenged

[29] *Id.*
[30] Sarah A. Keim et al*., Effect of Docosahexaenoic Acid Supplementation vs Placebo on Developmental Outcomes of Toddlers Born Preterm: A Randomized Clinical Trial*, JAMA PEDIATR. 172(12): 1126-1134 (Dec. 1, 2018), doi: 10.1001/jamapediatrics.2018.3082.
[31] *Id.*
[32] Angela M. Devlin et al., *Developmental Outcomes at 24 Months of Age in Toddlers Supplemented with Arachidonic Acid and Docosahexaenoic Acid: Results of a Double Blind, Randomized, Controlled Trial*, NUTRIENTS 9(9):975 (Sep. 6, 2017), doi: 10.3390/nu9090975.
[33] Fuchs, *supra* note 5.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Representations thus fit squarely within the contours of proscribed nutrient content claims for food intended for children younger than two years of age, violating 21 C.F.R. 101.13(b)(3).

**E.**    **Consumers Were Misled by the Challenged Representations to Their Detriment**

59.    **Products.** Abbott manufactures, markets, promotes, advertises, labels, packages, and sells Similac Go & Grow 360 Total Care Powder, Similac Go & Grow 360 Total Care Sensitive Powder, PediaSure Grow & Gain Bottles, PediaSure Grow & Gain Cans, PediaSure Grow & Gain Fiber, PediaSure Grow & Gain Shake Mix Powder, and PediaSure SideKicks, each of which displays one or more of the Challenged Representations on the Products' front-facing labels.

60.    **The Challenged Representations.** On the Products' front labels, Abbott conspicuously displays the Challenged Representations. Specifically, Abbott falsely and misleadingly labels the Products with the statements "Complete, Balanced Nutrition," "Balanced Nutrition to Help Fill Gaps," "#1 Pediatrician Recommended Brand," "DHA Omega-3," "DHA," and "Brain Development" despite the facts that the Products are neither nutritious for toddlers nor recommended by pediatricians, and the ingredient DHA does not support brain development.

61.    **Reasonable Consumer's Perception.** The Challenged Representations lead reasonable consumers, like Plaintiffs, to believe that the Products provide balanced nutrition and specific health benefits for toddlers when they do not. Many consumers are interested in purchasing nutritious drinks for their toddlers to improve their health and supplement their diets with perceived missing nutrients. Front-label representations, such as the Challenged Representations, are highly material to their purchasing decisions. As such, the Challenged Representations lead reasonable consumers to believe that the Products provide balanced nutrition for toddlers, are recommended by pediatricians, and support toddlers' brain development with the ingredient DHA.

62.    **Materiality.** The Challenged Representations are material to reasonable consumers, including Plaintiffs, in deciding to buy the Products—meaning that it is important to consumers that the Products are nutritious for children and support their development, thereby motivating them to buy the Products. Nutrition-related claims are a top purchase driver for all consumers and are especially important to parents and other caregivers when making purchases for their children.

///

63.    **Reliance.** The Class, including Plaintiffs, reasonably relied on the Challenged Representations in deciding to purchase the Products, as Plaintiffs, as well as the Class, made their purchase decisions based at least in part on their reasonable belief that Abbott's Products were nutritious drinks that bolster toddlers' health.

64.    **Falsity.** The Challenged Representations are false, misleading, and deceptive because, contrary to the front-label statements "Complete, Balanced Nutrition," "Balanced Nutrition to Help Fill Gaps," "#1 Pediatrician Recommended Brand," "DHA Omega-3," "DHA," and "Brain Development," the Products are not nutritious for toddlers, they are not recommended by pediatricians, and the ingredient DHA does not support brain development.

65.    **Consumers Lack Knowledge of Falsity.** The Class members who purchased the Products, including Plaintiffs, do not know and had no reason to know, at the time of purchase, that the Products' Challenged Representations are false, misleading, deceptive, and unlawful. Further, the Products' actual formulation fails to provide sufficient notice to consumers, who reasonably rely on the Challenged Representations as assurances that the Products are healthy for toddlers and can help balance their diet and nurture brain development—and who, unlike Abbott, do not possess the specialized knowledge required to conclude that a toddler formula advertised to bolster toddlers' health nevertheless contains harmful added sugars and additives and is condemned by most health organizations around the world as an unhealthy and harmful product.

66.    **Abbott's Knowledge.** Abbott knew, or should have known, that the Challenged Representations are misleading, deceptive, and unlawful at the time Abbott manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representations to Plaintiffs and the Class.

a.    **Knowledge of Reasonable Consumers' Perception.** Abbott knew or should have known that the Challenged Representations would lead reasonable consumers to believe that the Products are healthy, nutritious drinks that help toddlers' brains develop. Not only has Abbott utilized a long-standing brand strategy to identify the Products as healthy beverages to provide toddlers with important nutrients, but Abbott also has an obligation under Section 5 of the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Federal Trade Commission Act, codified at 15 U.S.C. Section 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Abbott was statutorily obligated to consider whether the Challenged Representations, whether in isolation or in conjunction with Abbott's marketing strategy, would mislead reasonable consumers into believing that the Products are nutritious for toddlers, recommended by pediatricians, and helpful for toddlers' brain development. Thus, Abbott either knew that the Challenged Representations were misleading before it marketed the Products to the Class, including Plaintiffs, or Abbott would have known that that it was deceptive had it fulfilled its statutory obligation to evaluate the nature and impacts of the Challenged Representations on reasonable consumers.

b.  **Knowledge of Falsity.** Abbott manufactured and marketed the Products with the Challenged Representations despite these Products not conforming with the representations. Specifically, Abbott advertised and labeled the Products with the Challenged Representations but chose to design and manufacture these Products with levels of added sugar that no responsible physician could recommend and that cannot provide the claimed support for brain development.

c.  **Knowledge of Materiality.** Abbott knew or should have known of the Challenged Representations' materiality to consumers. ***First***, manufacturers and marketers like Abbott generally reserve the front primary display panel of labels on consumer products for the information they believe will most effectively persuade consumers to buy the products. I.e., the *primary goal* of manufacturers in designing their front-label statements is to materially impact consumers' shopping and purchasing decisions. Here, the conspicuousness of the Challenged Representations on the Products' labels demonstrates Abbott's awareness of their importance to consumers and Abbott's understanding and expectation that consumers would be attracted to buy products that advertised

28

the supposed product benefits asserted through the Challenged Representations. ***Second***, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping consumers' expectations, because they believe those repeated messages will drive consumers to buy their products. Here, Abbott's constant, unwavering use of the Challenged Representations on countless Product labels and advertisements as well as throughout Abbott's marketing campaign evidences Abbott's awareness that the claimed qualities promoted through the Challenged Representations are important to consumers. It also evidences Abbott's intent to convince consumers that the Products conform to the Challenged Representations and, in turn, prompt consumers to buy the Products. ***Third***, the Products' primary—if not only—advertised purpose was to provide a nutritious drink to fortify toddlers' health. Thus, Abbott knew, in designing and marketing the Products using the verbiage in question, that the Challenged Representations were material to consumers.

d.      **Abbott's Continued Deception, Despite Its Knowledge.** Abbott, as the manufacturer and marketer of the Products, had exclusive control over the Challenged Representations' inclusion on the Products' labels and advertisements—i.e., Abbott readily and easily could have stopped using the Challenged Representations to sell the Products. However, despite Abbott's knowledge of the Challenged Representations' falsity and the high likelihood that consumers would reasonably rely on the Challenged Representations in deciding to buy the Products, Abbott deliberately chose to market the Products with the Challenged Representations, thereby misleading consumers into buying or overpaying for the Products. Thus, Abbott knew, or should have known, at all relevant times that the Challenged Representations would mislead reasonable consumers, such as Plaintiffs, into buying the Products to attain the Product attributes that Abbott falsely advertised and warranted.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

29

67.    **Detriment.** Plaintiffs and similarly situated consumers would not have purchased the Products or would not have paid a price premium for them if they had known that the Challenged Representations were false and misleading—and that the Products thus do not provide balanced nutrition for toddlers, are generally condemned by pediatricians, and do not support toddlers' brain development through the inclusion of the ingredient DHA. Each such claim was claimed, promised, warranted, advertised, and/or represented by Abbott. Accordingly, based on Abbott's Challenged Representations, reasonable consumers, including Plaintiffs, purchased the Products to their detriment.

## F.    The Products are Substantially Similar

68.    As described above, Plaintiffs purchased Defendant's Similac Go & Grow Products as well as Defendant's PediaSure Grow & Gain Bottles in the chocolate and vanilla flavors (the "**Purchased Products**"). The additional Products identified *supra* (collectively, the "**Unpurchased Products**") are substantially similar to the Purchased Products.

    a.    **Abbott.** All Products are manufactured, sold, marketed, advertised, and labeled by Abbott.

    b.    **Brand.** All Products are sold under the same two brand names— PediaSure or Similac—and all Products display the parent brand "Abbott" and its logo on the front labeling.

    c.    **Marketing Demographics.** All Products are marketed directly to consumers for personal consumption.

    d.    **Purpose.** All Products are beverages, either in liquid or powder form, marketed as nutritious drinks for toddlers.

    e.    **Use.** All Products are used in the same manner: consumed as beverages, either directly from the container or by adding water or another liquid to the powdered mix product.

    f.    **Challenged Representations.** All Products contain one or more of the Challenged Representations on their labeling.

    g.    **Packaging.** All Products are packaged in similar packaging.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

h. **Key Attributes.** All Products claim to support toddlers' health while failing to conform to these promises.

**Misleading Effect.** The misleading effect of the Challenged Representations on consumers is the same for all Products: Consumers overpay for beverages that are advertised as nutritious, recommended by pediatricians, and beneficial for toddlers' brain development through the inclusion of DHA, when in reality the Products contain harmful quantities of added sugar, are widely condemned (rather than "recommended") by pediatric and health organizations, and do not support brain development due to the inclusion of the ingredient DHA.

**G.    No Adequate Remedy at Law**

69.    **No Adequate Remedy at Law.** Plaintiffs and members of the Class are entitled to equitable relief because no adequate remedy at law exists.

a. **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the California Unfair Competition Law ("**UCL**"), which is one year longer than the statutes of limitations under the California False Advertising Law ("**FAL**") and California Consumers Legal Remedies Act ("**CLRA**"). In addition, the statutes of limitations periods for breach of warranty and unjust enrichment/restitution causes of action vary (generally between approximately two and six years) under state law in the states in which Nationwide Class members reside and/or purchased Abbott's Products. Thus, California Subclass members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL. Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach of warranty will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

b. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

It includes, for example, Abbott's overall unfair marketing scheme to promote and brand the Products with the Challenged Representations across a multitude of media platforms, including the Products' labels, over a long period of time, in order to gain an unfair advantage over competitor products and to exploit consumers' desire for products that comport with the Challenged Representations. The UCL also creates a cause of action for violations of law, including violations of statutory law, regulations, or court orders related to similar representations made about the type of products at issue. Thus, Plaintiffs and Class members may be entitled to restitution under the UCL but not to damages under other causes of action asserted herein. (E.g., the FAL requires actual or constructive knowledge of the falsity, while the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes).) Similarly, unjust enrichment/restitution is broader than breach of warranty.  For example, in some states, breach of warranty may require privity of contract or pre-lawsuit notice, which are not typically required to establish unjust enrichment/restitution. Thus, Plaintiffs and Class members may be entitled to recover under an unjust enrichment/restitution cause of action but may not be entitled to recover damages for breach of warranty if, e.g., they purchased the Products from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

c.  **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiffs and members of the Class because Abbott continues to misrepresent the Products with the Challenged Representations. Injunctive relief is necessary to prevent Abbott from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures, is necessary to dispel the public misperception about the Products that has resulted from years of Abbott's unfair, fraudulent, and unlawful

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements providing accurate information about the Products' true nature and/or requiring prominent qualifications and/or disclaimers on the Products' front labeling concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon is also not available through a legal remedy (such as monetary damages). In addition, Plaintiffs are currently unable to accurately quantify the damages caused by Abbott's future harm because discovery and Plaintiffs' investigation have not yet completed, rendering injunctive relief all the more necessary. For example, because the Court has not yet certified any class, the following remains unknown: the scope of any class or sub-class, the identities of the members of such class(es), the proposed class members' respective purchasing practices, Abbott's revenues realized through past/future Products sales, and the quantities of past/future Products sales.

d. **Public Injunction**. Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

e. **California vs. Nationwide Class Claims**. Violations of the UCL, FAL, and CLRA are claims asserted on behalf of Plaintiffs and the California Subclass against Abbott, while breach of warranty and unjust enrichment/restitution are asserted on behalf of Plaintiffs and the Nationwide Class. Dismissal of farther-reaching claims, such as restitution, would bar recovery for non-California members of the Nationwide Class. In other words, legal remedies available or adequate under the California-specific causes of action (such as the UCL, FAL, and CLRA causes of action) have no impact on this Court's jurisdiction to award equitable relief under the remaining causes of action asserted on behalf of non-California putative Nationwide Class members.

f. **Procedural Posture—Incomplete Discovery & Pre-Certification.** Lastly, this is an initial pleading in this action, and discovery has not yet commenced and/or is at its

initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, is necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable remedies, as to both Plaintiffs' individual claims and those of any certified class or subclass. Plaintiffs therefore reserves Plaintiffs' rights to amend this Complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiffs and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## VI.    CLASS ACTION ALLEGATIONS

70.    **Class Definition.** Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated as members of the Class defined as follows:

All residents of the United States who, within the applicable statute of limitations periods, purchased the Products containing the Challenged Representations on the Products' labels for purposes other than resale ("**Nationwide Class**"); *and*

All residents of California who, within four years prior to the filing of this action, purchased the Products containing the Challenged Representations on the Products' labels for purposes other than resale ("**California Subclass**").

The "Nationwide Class" and "California Subclass" are collectively referred to as the "**Class.**"

71.    **Class Definition Exclusions.** Excluded from the Class are: (i) Abbott, its assigns, successors, and legal representatives; (ii) any entities in which Abbott has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

72. **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Abbott, or otherwise.

73. **Numerosity.** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

74. **Common Questions Predominate.** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

    a.    Whether Abbott engaged in unlawful, unfair, or deceptive business practices by advertising and selling the Products;

    b.    Whether Abbott's conduct of advertising and selling the Products as nutritious for toddlers, pediatrician-recommended, and helpful for toddlers' brain development through the inclusion of DHA constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code Section 1750, *et seq.*;

    c.    Whether Abbott used deceptive representations in connection with the sale of the Products in violation of Civil Code Section 1750, *et seq.*;

    d.    Whether Abbott represented that the Products have characteristics or quantities that they do not have in violation of Civil Code Section 1750, *et seq.*;

    e.    Whether Abbott advertised the Products with intent not to sell them as advertised in violation of Civil Code Section 1750, *et seq.*;

    f.    Whether Abbott's labeling and advertising of the Products are misleading in violation of Business and Professions Code Section 17500, *et seq.*;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

g.    Whether Abbott knew or by the exercise of reasonable care should have known its labeling and advertising was and is misleading in violation of Business and Professions Code Section 17500, *et seq*.;

h.    Whether Abbott's conduct is an unfair business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

i.    Whether Abbott's conduct is a fraudulent business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

j.    Whether Abbott's conduct is an unlawful business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

k.    Whether Plaintiffs and the Class paid more money for the Products than they actually received;

l.    How much more money Plaintiffs and the Class paid for the Products over they actually received;

m.    Whether Abbott's conduct constitutes breach of warranty;

n.    Whether Plaintiffs and the Class are entitled to injunctive relief; *and*

o.    Whether Abbott was unjustly enriched by its unlawful conduct.

75.    **Predominance**. The common questions of law and fact predominate over questions that affect only individual Class Members.

76.    **Typicality.**  Plaintiffs' claims are typical of the claims of the Class Members they seek to represent because Plaintiffs, like the Class Members, purchased Abbott's misleading and deceptive Products. Abbott's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Abbott's conduct. Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

77.    **Adequacy.** Plaintiffs are adequate representatives of the Class they seek to represent because Plaintiff' interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs will fairly and adequately protect Class Members' interests, and they have

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

78.    **Ascertainability.** Class Members can easily be identified by an examination and analysis of the business records regularly maintained by Abbott, among other records within Abbott's possession, custody, or control. Additionally, further Class Member data can be obtained through additional third-party retailers who retain customer records and order histories.

79.    **Superiority and Substantial Benefit.** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a.    The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

    b.    Absent a Class, the members of the Class will continue to suffer damage and Abbott's unlawful conduct will continue without remedy while Abbott profits from and enjoys its ill-gotten gains;

    c.    Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Abbott committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d.    When the liability of Abbott has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; *and*

    e.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Abbott.

80.    **Inconsistent Rulings.** Because Plaintiffs seek relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying

adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Abbott.

81.    **Injunctive/Declaratory Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief are met, as Abbott has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

82.    **Manageability.** Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.  <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

**Violation of California False Advertising Law**

**(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

**(*On Behalf of the California Subclass*)**

83.    **Incorporation by reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint as though fully set forth herein.

84.    **California Subclass.** Plaintiffs brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

85.    **FAL Standard.**  The False Advertising Law, codified at California Business and Professions Code Section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

86.    **Challenged Representations Disseminated to Public.** Abbott violated the FAL when it advertised and marketed the Products using the Challenged Representations, which were deceptive because the Products do not conform to their assertions. The Challenged Representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

87.    **Knowledge.** In making and disseminating the Challenged Representations alleged herein, Abbott knew or should have known that the Challenged Representations were untrue or

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

misleading, and acted in violation of the FAL.

88. **Intent to Sell.** Abbott's Challenged Representations were specifically designed to induce reasonable consumers, like Plaintiffs and the California Subclass, to purchase the Products.

89. **Causation/Damages.** As a direct and proximate result of Abbott's misconduct in violation of the FAL, Plaintiffs and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the California Subclass for said monies as well as injunctive relief to enjoin Abbott's misconduct to prevent ongoing and future harm that will result.

**COUNT TWO**

**Violation of California Consumers Legal Remedies Act**

**(Cal. Civ. Code § 1750, *et seq.*)**

**(*On Behalf of the California Subclass*)**

90. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

91. **California Subclass.** Plaintiffs brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

92. **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

93. **Goods/Services.** The Products are "goods" as defined by the CLRA under California Civil Code Section 1761(a).

94. **Abbott.** Abbott is a "person" as defined by the CLRA under California Civil Code Section 1761(c).

///

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

95. **Consumers.** Plaintiffs and members of the California Subclass are "consumers" as defined by the CLRA under California Civil Code Section1761(d).

96. **Transactions.** The purchase of the Products by Plaintiffs and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code Section 1761(e).

97. **Violations of the CLRA.** Abbott violated the following sections of the CLRA by selling the Products to Plaintiffs and the California Subclass through the misleading, deceptive, and fraudulent Challenged Representations:

   a. Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have."

   b. Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."

   c. Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

   d. Section 1770(a)(16) by representing that the Products have "been supplied in accordance with a previous representation" when they have not.

98. **Knowledge.** Abbott's uniform and material Challenged Representations regarding the Products were likely to deceive.

99. **Malicious.** Abbott's conduct was malicious, fraudulent, and wanton in that Abbott intentionally misled and withheld material information from consumers, including Plaintiffs, to increase sales of the Products.

100. **Plaintiffs Could Not Have Avoided Injury.** Plaintiffs and members of the California Subclass could not have reasonably avoided such injury. Plaintiffs and members of the California Subclass were misled and unaware of the existence of facts that Abbott suppressed and failed to disclose, and Plaintiffs and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

101. **Causation/Reliance/Materiality.** Plaintiffs and the California Subclass suffered harm due to Abbott's violations of the CLRA because they relied on the Challenged Representations

1   in deciding to purchase the Products. The Challenged Representations factored substantially into

2   the decisions by Plaintiffs and the California Subclass to purchase the Products.

3        102.  **Section 1782(d)—Prelitigation Demand/Notice.** Pursuant to California Civil Code

4   Section 1782, more than 30 days prior to the filing of this complaint, Plaintiffs' counsel, acting on

5   behalf of all members of the Class, mailed a Demand Letter via U.S. Certified Mail, return receipt

6   requested, addressed to Abbott Laboratories at its headquarters and principal place of business

7   registered with the California Secretary of State (100 Abbott Park Road, D367 AP6D, Abbott Park,

8   IL 60064) and its registered agent for service of process (CT Corporation System, 330 North Brand

9   Boulevard, Suite 700, Glendale, CA 91203). Delivery of the Demand Letter to Abbott's registered

10  agent was confirmed.

11       103.  **Causation/Damages.** As a direct and proximate result of Abbott's misconduct in

12  violation of the CLRA, Plaintiffs and members of the California Subclass were harmed in that they

13  were fraudulently induced into purchasing a product they either would not have purchased at the

14  price they did or not have purchased at all. As a result of Abbott's conduct described herein,

15  Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other

16  damages, including, but not limited to, the amounts paid for the Products and any interest that would

17  have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seeks a

18  monetary award for violation of the CLRA in the form of damages, restitution, and/or disgorgement

19  of ill-gotten gains to compensate Plaintiffs and the California Subclass for said monies.

20       104.  **Injunction.** Given that Abbott's conduct violated California Civil Code Section 1780,

21  Plaintiffs and members of the California Subclass are entitled to—and do hereby—seek injunctive

22  relief to put an end to Abbott's violations of the CLRA and to dispel the public misperception

23  generated, facilitated, and fostered by Abbott's false advertising campaign. Plaintiffs have no

24  adequate remedy at law. Without equitable relief, Abbott's unfair and deceptive practices will

25  continue to harm Plaintiffs and the California Subclass. Accordingly, Plaintiffs seek an injunction

26  to enjoin Abbott from continuing to employ the unlawful methods, acts, and practices alleged herein

27  pursuant to Section 1780(a)(2), and otherwise require Abbott to take corrective action necessary to

28  dispel the public misperception engendered, fostered, and facilitated through Abbott's deceptive

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

41

labeling of the Products with the Challenged Representations.

105. **Punitive Damages.** Abbott's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Abbott's misconduct is malicious, as Abbott acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Abbott willfully and knowingly disregarded the rights of Plaintiffs and California Subclass members, as Abbott was at all times aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs. Abbott's misconduct was oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs and the California Subclass to cruel and unjust hardship in knowing disregard of their rights, as Abbott's aggressive promotion of the Products through its use of the Challenged Representations induced thousands of parents and other caregivers to purchase formula for children under their care based on a reasonable—but ultimately mistaken—assumption that the Products were nutritionally complete and/or balanced, pediatrician-approved, and fortified with an ingredient (in DHA) that promoted brain development among these toddlers. And Abbott's misconduct was fraudulent because Abbott at all relevant times intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and California Subclass members. Abbott's officers, directors, and/or managing agents committed, authorized, adopted, approved, and/or ratified this wrongful conduct constituting malice, oppression, and/or fraud. An award of punitive damages is thus appropriate and warranted to reduce the possibility that Abbott's executives might view any outcome here as an acceptable cost of doing business in this multi-billion-dollar industry.

///
///
///
///
///

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

## COUNT THREE

### Violation of California Unfair Competition Law

### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

### (*On Behalf of the California Subclass*)

106. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

107. **California Subclass.** This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of Plaintiffs and a California Subclass composed of consumers who purchased the Products within the applicable statute of limitations.

108. **The UCL.** California Business & Professions Code Section 17200, *et seq.* (the **"UCL"**) prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

109. **False Advertising Claims.** Abbott, in its advertising of the Products, made false and misleading statements through the false claims asserted in its Challenged Representations regarding the quality and characteristics of the Products—specifically, through its widespread use of the Challenged Representations to promote and sell the Products. Such claims appear on the front labels of the Products, which are sold at retail stores, including through point-of-purchase displays, as well as in Abbott's website advertising materials.

110. **Abbott's Deliberately Fraudulent Marketing Scheme.** Abbott does not have any reasonable basis to support the veracity of the Challenged Representations promoting the Products because the Products do not provide "complete" and/or "balanced" nutrition for toddlers, are not pediatrician-recommended, and do not support toddlers' brain development through the inclusion of DHA. Abbott knew and knows that the Products do not supply "complete" and/or "balanced" nutrition because (1) as with other toddler formulas, unlike infant formulas for which this is required and enforced by the FDA, they are not designed to meet the complete nutritional needs of the very young children they target, and (2) they contain harmful levels of added sugars—up to 12 grams per serving; knew and knows that the Products are not pediatrician-recommended (and are, in fact,

uniformly *condemned* by pediatric and health organizations); and knew and knows that the ingredient DHA does not support toddlers' brain development. Despite this knowledge, Abbott intentionally advertised and marketed the Products with the Challenged Representations to deceive reasonable consumers.

111.  **Misleading Advertising Claims Cause Purchase of Products.** Abbott's labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiffs, believing that the Products are healthy, nutritional drinks for toddlers that are recommended by pediatricians and that support brain development with DHA.

112.  **Injury in Fact.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money or other property as a result of and in reliance upon the Challenged Representations. Namely, Plaintiffs and the California Subclass lost the purchase price for the Products they bought from Abbott.

113.  **Conduct Violates the UCL.** Through its conduct described herein, Abbott committed serial unfair, unlawful, and fraudulent business practices in violation of the UCL. Cal. Bus & Prof. Code § 17200 (prohibited "unfair competition" includes "unlawful, unfair, or fraudulent business practices"). And through its use of various forms of media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner, Abbott engaged in unfair, deceptive, untrue or misleading advertising, also in violation of the UCL. *Ibid*. ("unfair competition" also includes "unfair, deceptive, untrue or misleading advertising"). Such acts amount to unlawful business practices within the meaning of Business and Professions Code Section 17200, *et seq*., as Abbott's use of the Challenged Representations advertisements have deceived and are likely to deceive the consuming public.

114.  **No Reasonably Available Alternatives/Legitimate Business Interests.** Abbott failed to avail itself of reasonably available lawful alternatives to further its legitimate business interests.

115.  **Business Practice.** All of the conduct alleged herein occurred and continues to occur in Abbott's business. Abbott's wrongful conduct is part of a pattern, practice and/or generalized course of conduct that will continue on a daily basis until Abbott voluntarily alters its conduct or is

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  ordered to do so.

2      116.  **Injunction.** Pursuant to Business and Professions Code Sections 17203 and 17535,

3  Plaintiffs and the members of the California Subclass seek an order of this Court enjoining Abbott

4  from continuing to engage, use, or employ its practice of labeling and advertising the sale and use

5  of the Products through the deployment of deceptive claims, including those of the Challenged

6  Representations, to halt ongoing harm and prevent future harm caused by Abbott's use of the

7  Challenged Representations' false and deceptive false claims.

8      117.  **Causation/Damages.** As a direct and proximate result of Abbott's misconduct in

9  violation of the UCL, Plaintiffs and members of the California Subclass were harmed in the amount

10  of the purchase price they paid for the Products. Further, Plaintiffs and members of the California

11  Subclass have suffered and continue to suffer economic losses and other damages, including, but

12  not limited to, the amounts paid for the Products and any interest that would have accrued on those

13  monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for

14  violation of the UCL in the form of restitution to compensate Plaintiffs and the California Subclass

15  for their losses.

16                          ***"Unfair" Prong***

17      118.  **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury

18  it causes outweighs any benefits provided to consumers and the injury is one that the consumers

19  themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal.

20  App. 4th 1394, 1403 (2006).

21      119.  **Injury.** Abbott's sweeping use of the Challenged Representations to promote its

22  Products confers absolutely no benefit on consumers, instead deceiving them into incorrectly

23  believing that the Products are nutritionally complete and/or balanced, pediatrician-recommended,

24  and beneficial to toddlers' brain development due to their inclusion of DHA. Rather, Abbott's acts

25  as described herein cause great harm to consumers in that they both deceive consumers into paying

26  for products that are not what they represent to be while at the same time depriving those consumers

27  of the opportunity to instead purchase toddler formula *not* promoted through false claims. In so

28  doing, Abbott has caused and continues to cause injuries to consumers, who do not receive products

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

commensurate with their reasonable expectations, overpay for the Products, receive Products of lesser standards than what they reasonably expected to receive, and are exposed to increased health risks by unknowingly consuming greater quantities of added sugars and processed ingredients than the Challenged Representations would lead a reasonable consumer to believe, without providing any potentially countervailing benefit.

120. **Balancing Test.** Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under the UCL. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

121. **No Utility.** Here, Abbott's conduct of promoting the Products through the deployment of the Challenged Representations when the Products are not in fact nutritious for toddlers, are not pediatrician-recommended, and do not facilitate toddlers' brain development has no utility. And as described in detail herein, the same conduct causes harm to consumers, including Plaintiffs and the Class Members, that is significant in that it deprives them of both money and the opportunity to accurately assess which toddler formula (if any) they wish to feed their children. Thus, the utility of Abbott's conduct is vastly outweighed by the gravity of the harm it causes.

122. **Legislative-Declared Policy.** Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007). Here, Abbott's conduct has impacted and continues to impact its competition in that the Challenged Representations wrongfully promote the Products based on false claims, leading to artificially inflated sales in the highly competitive and lucrative toddler formula industry.

123. **Unfair Conduct.** Abbott's use of its deceptive, misleading, and unreasonable Challenged Representations in its labeling and advertising of the Products, as alleged herein, constitutes unfair conduct of which Abbott knew or should have known. Abbott's use of the Challenged Representations to promote and sell its Products thus constitutes an unfair business practice within the meaning of the UCL.

///

124. **Reasonably Available Alternatives.** Abbott enjoyed reasonably available alternatives to the conduct described herein to further its legitimate business interests. Specifically, Abbott could have refrained from promoting the Products using the Challenged Representations or any other misleading assertion.

125. **Abbott's Wrongful Conduct.** All of the conduct alleged herein was and remains part and parcel of Abbott's business operations. Abbott's wrongful conduct is part of a pattern or generalized course of conduct repeated, on information and belief, thousands of times every day.

126. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiffs and the California Subclass seek an order of this Court enjoining Abbott from continuing to promote the Products using the Challenged Representations, including by using them on Product labeling and in Abbott marketing materials.

127. **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact, have lost money, and were exposed to increased health risks as a result of Abbott's unfair conduct. Plaintiffs and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiffs and the California Subclass paid for Products that are nutritious for toddlers, recommended by pediatricians, and support toddlers' brain development with DHA. Plaintiffs and the California Subclass would either have paid substantially less for the Products or not bought them at all had they known that the Products' advertising and labeling were false and misleading. Accordingly, Plaintiffs and the California Subclass seek restitution as recompensation for the financial losses they incurred due to Abbott's violations of the UCL.

### *"Fraudulent" Prong*

128. **Fraud Standard.** The UCL considers conduct fraudulent (and prohibited) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

129. **Fraudulent & Material Challenged Representations.** Abbott used the Challenged Representations with the intent to sell the Products to consumers, including Plaintiffs and the California Subclass. The Challenged Representations are deceptive, and Abbott knew or should have known as much. The Challenged Representations have at all relevant times been likely to

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

mislead consumers into purchasing the Products because they were and are material to the average reasonable consumer.

130. **Fraudulent Business Practice.** As alleged herein, Abbott's use of the Challenged Representations on the Products' front labels and in Abbott's marketing materials to deceive consumers into purchasing the Products constitutes a fraudulent business practice in violation of the UCL.

131. **Reasonable and Detrimental Reliance.** Plaintiffs and the California Subclass reasonably relied on the Challenged Representations to their detriment because the Challenged Representations drove them to purchase the Products at the Products' respective market prices, which were inherently and necessarily inflated because the goods delivered were inferior to those promised.

132. **Reasonably Available Alternatives.** Abbott had reasonably available alternatives to further its legitimate business interests other than the conduct described herein. Specifically, Abbott could have refrained from labeling the Products with the Challenged Representations to induce reasonable consumer to buy the Products.

133. **Business Practice.** All of the conduct alleged herein occurs and continues to occur during the course of Abbott's business operations. Abbott's wrongful conduct is part of a pattern or generalized course of conduct.

134. **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the California Subclass seek an order of this Court enjoining Abbott from continuing to engage, use, or employ its practice of labeling the Products with the Challenged Representations.

135. **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money as a result of Abbott's fraudulent conduct. Plaintiffs paid an unwarranted premium for the Products. Specifically, Plaintiffs and the California Subclass paid for Products that are nutritious for toddlers, recommended by pediatricians, and support toddlers' brain development with DHA when, in fact, the Products are not nutritious, not recommended by pediatricians, and do not support toddlers' brain development. Plaintiffs and the California Subclass would not have purchased the Products had they known the truth. Accordingly, Plaintiffs and the California

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    Subclass seek restitution pursuant to the UCL.

2                              ***"Unlawful" Prong***

3        136.  **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful

4    practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC*

5    *Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

6        137.  **Violations of CLRA and FAL.** Abbott's labeling of the Products, as alleged herein,

7    violates California Civil Code Sections 1750, *et seq.* (the "**CLRA**") and California Business and

8    Professions Code Sections 17500, *et seq.* (the "**FAL**"), as set forth above in the sections regarding

9    those causes of action.

10       138.  **Fraud.** In addition to violating the CLRA and FAL, Abbott's use of the Challenged

11   Representations to deceive consumers into purchasing the Products violates California Civil

12   Code Sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and

13   1711 (deceit upon the public).

14       139.  **Additional Violations.** Abbott's conduct as described herein constituted and

15   continues to constitute a knowing failure to adopt policies in accordance with and/or adherence to

16   applicable laws, as set forth herein, all of which are binding upon and burdensome to its competitors.

17   As Abbott knew or should have known, this conduct engendered an unfair competitive advantage

18   for Abbott and constitutes unfair and fraudulent business practices in violation of the UCL.

19       140.  **Reasonably Available Alternatives.** Abbott had reasonably available alternatives to

20   further its legitimate business interests other than the conduct described herein. Specifically, Abbott

21   could have refrained from breaking the law by labeling and otherwise promoting the Products with

22   its deceptive Challenged Representations.

23       141.  **Business Practice.** All of the conduct alleged herein occurs and continues to occur

24   within Abbott's business operations. Abbott's wrongful conduct is part of a pattern or generalized

25   course of conduct.

26       142.  **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiffs and

27   the California Subclass seek an order of this Court enjoining Abbott from continuing to engage, use,

28   or employ its practice of deceptive advertising of the Products.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

143.   **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money as a result of Abbott's unlawful conduct. Plaintiffs and the California Subclass paid an unwarranted premium for the Products. Plaintiffs and the California Subclass would not have purchased the Products if they had known that Abbott purposely deceived consumers into believing that the Products were nutritious for toddlers, pediatrician-recommended, and support toddlers' brain development with DHA. Accordingly, Plaintiffs seek restitution pursuant to the UCL.

## <u>COUNT FOUR</u>

### Breach of Warranty

### (*On Behalf of the Nationwide Class and California Subclass*)

144.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

145.   **Nationwide Class & California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

146.   **Express Warranty.** As described herein, Abbott issued promises and affirmations of fact by using the Challenged Representations on the Products' labeling and supportive marketing and advertising materials as it promoted the Products. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiffs and members of the Class on the one hand and Abbott on the other. Through its design and release of the Products' labeling and advertising, Abbott purported to create express warranties that the Products, among other things, conformed to the Challenged Representations.

147.   **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Abbott, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs and members of the Class on the one hand and Abbott on

the other—to wit, that the Products, among other things, conformed to the Challenged Representations.

148. **Breach of Warranty.** Contrary to Abbott's warranties, the Products did and do *not* conform to the Challenged Representations, and Abbott thus breached its warranties about the Products and their asserted qualities.

149. **Causation/Remedies.** As a direct and proximate result of Abbott's breach of warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages, including, but not limited to, the amounts paid for the Products and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies as well as injunctive relief to enjoin Abbott's misconduct to prevent ongoing and future harm that will result.

150. **Punitive Damages.** Plaintiffs seek punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiffs and the Class. Abbott's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Abbott's misconduct is malicious as Abbott acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Abbott willfully and knowingly disregarded the rights of Plaintiffs and the Class because Abbott was aware of the probable dangerous consequences of its conduct yet deliberately failed to avoid misleading consumers, including Plaintiffs. Abbott's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct. Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. And Abbott's misconduct is fraudulent as Abbott, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and the Class. Again, Abbott's officers, directors, and/or managing agents committed, authorized, adopted,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

approved, and/or ratified Abbott's wrongful conduct constituting malice, oppression, and/or fraud.

## COUNT FIVE

### Unjust Enrichment/Restitution

### (*On Behalf of the Nationwide Class and California Subclass*)

151. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this Complaint, as though fully set forth herein.

152. **Nationwide Class & California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass (collectively, the Class), members of which purchased the Products within the applicable statute of limitations.

153. **Plaintiffs/Class Conferred a Benefit.** By purchasing the Products, Plaintiffs and members of the Class conferred a benefit on Abbott in the form of the purchase price of the Products.

154. **Abbott's Knowledge of Conferred Benefit.** Abbott had knowledge of such conferred benefit and appreciated the conferred benefit because were consumers not to purchase the Products, Abbott would not generate revenue from the sales of the Products.

155. **Abbott's Unjust Receipt Through Deception.** Abbott's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained through Abbott's fraudulent, misleading, and deceptive labeling and advertising of the Products.

156. **Causation/Damages.** As a direct and proximate result of Abbott's unjust enrichment, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer other damages, including, but not limited to, any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains and interest to compensate Plaintiffs and the Class for the loss of use and enjoyment of said monies. Plaintiffs also seek injunctive relief to enjoin Abbott's misconduct to prevent ongoing and future harm that would otherwise result.

157. **Punitive Damages**. Plaintiffs seek punitive damages pursuant to this cause of action for unjust enrichment on behalf of Plaintiffs and the Class. Abbott's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting

an award of punitive damages as permitted by law. Abbott's misconduct was malicious, as Abbott acted with the intent to cause Plaintiffs and members of the Class to pay for Products that they were not, in fact, receiving. Abbott willfully and knowingly disregarded the rights of Plaintiffs and other consumers, as Abbott was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs. Abbott's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs and other consumers to cruel and unjust hardship in knowing disregard of their rights. Abbott's misconduct is fraudulent, as Abbott, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and other consumers. Officers, directors, and/or managing agents of Abbott committed, authorized, adopted, approved, and/or ratified this wrongful conduct constituting malice, oppression, and/or fraud.

## VIII.   PRAYER FOR RELIEF

158.   WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Abbott as follows:

a. **Certification:** For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b. **Declaratory Relief:** For an order declaring that Abbott's conduct violated the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

c. **Injunction:** For an order requiring Abbott to change its business practices to halt, prevent, or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, orders that Abbott immediately cease and desist from selling the unlawful Products in violation of law; that enjoin Abbott from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; and/or that require Abbott to take all further

and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

d. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with applicable law and pursuant to only those causes of action so permitted;

e. **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g. **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; *and*

h. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues and causes of action so triable.

Dated: December 26, 2024

By:

**CLARKSON LAW FIRM, P.C.**

 */s/ Bahar Sodaify*
Shireen M. Clarkson, Esq.
Bahar Sodaify, Esq.
Benjamin J. Fuchs, Esq.
Samuel M. Gagnon, Esq.

*Attorneys for Plaintiffs*